IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| China Harris,<br><br>Plaintiff,<br><br>v.<br><br>United Cerebral Palsy Seguin of Greater Chicago *et al.*,<br><br>Defendants. | No. 26 C 13505 |

<u>Memorandum Opinion and Order</u>

Plaintiff China Harris has worked for two years as an in-home caregiver to two developmentally disabled women under defendant United Cerebral Palsy Seguin of Greater Chicago ("UCP"). Harris complained to UCP about her classification as a contractor, rather than an employee, her hourly wage, her week-long shifts, and UCP's practice of deducting much of her pay from each of her paychecks. In response, UCP served her with a new contract and a threat to evict her in the event she refused to sign. Harris sued UCP—as well as Shantina Pugh, UCP's Director of Adult Services, and Joseph Mengoni, UCP's President and CEO—and moved for a temporary order restraining UCP's ultimatum on her own behalf and that of a putative class of other caregivers. I grant her motion in part.

# I.

## A. Background

Federal programs are sometimes administered directly, and sometimes the benefits they are supposed to offer reach their beneficiaries after winding their way through successive bureaucracies and public-private partnerships. Ordinarily, Medicaid recipients who require long-term care must reside in a long-term care facility. But many states operate "Medicaid waiver" programs, which allow alternative placements closer to the community. Illinois has nine Home and Community Based Service ("HCBS") programs that allow Medicaid recipients to "remain in their homes or live in a community setting."[1]

Under Illinois's HCBS programs, a developmentally disabled adult in need of residential support can be placed in one of a range of Community Integrated Living Arrangements ("CILAs"), which include the host family or 'adult foster-care' option.[2] The Illinois Department of Health and Family Services ("IDHS") contracts with third parties to provide CILAs to Medicaid

---

[1] "Home and Community Based Service Waivers," Ill. Dept. of Healthcare and Family Servs. (last visited Nov. 5, 2026), https://hfs.illinois.gov/medicalclients/hcbs.html.

[2] "Adults with Developmental Disabilities," Ill. Dept. of Healthcare and Family Servs. (last visited Nov. 5, 2026), https://hfs.illinois.gov/medicalclients/hcbs/dd.html.

beneficiaries, and UCP is one of these third parties. UCP, in turn, contracts with caregivers, who, finally, provide the services to the beneficiaries.

Harris is one of those caregivers, and since August 2024, she has provided services to two women in an adult foster care arrangement under the auspices of ILDHS's contract with UCP. Harris works in a "shared living" environment, where UCP owns the home in which she and her charges live. ECF 1 at 6. Except for periods where UCP sends an employee in to relieve Harris, she is responsible for her patients around-the-clock. This extends even into periods where Harris's charges are absent; both women attend adult day care-style services for eight hours a day on weekdays, but during that time Harris must clean the home they share, shop for groceries, and otherwise act as a 'foster' or 'host' mother to them. Although regulations call for regular relief for host parents, when her charges are ill, over holidays, or when help simply does not arrive, Harris has worked consecutive periods of up to 336 hours, and her typical work week spans 87 to 112 hours. UCP does not track Harris's hours worked and instead pays her an unchanging *per diem*.

Illinois regulations break down the funds that it grants to third parties to provide CILA services into four categories. The first is "[r]oom and board cost centers," which include the cost

of housing, utilities, food for the host family and beneficiaries, etc. 59 Ill. Admin. C. § 115.130(a)(1). The second is "[p]rogram cost centers," which includes, largely, pay for "[d]irect care staff," their supervisors, and benefits. *Id.* (a)(2). The third is for the transportation costs incurred by CILA providers, and the fourth provides for all of the overhead administrative costs of running the third-party provider. *Id.* (a)(3)–(4).

The amount IDHS allots to the second category, for staffing, is called a "stipend," and is paid at a daily rate per beneficiary in the home, depending on their level of need. In 2025 that rate ran from $115 to $138; in 2026 it has been $124 to $147. UCP then decides what part of that stipend is "supervision" and what part goes to the actual provision of services, which is to say, Harris. Harris receives $51.28 per day for her less needy charge and $56.28 per day for her more needy one, for a total of $107.56 per day or $752.92 per week.[3] UCP does not pay her overtime. While IDHS's first bucket should ostensibly cover UCP's room and board costs in providing the home and food and other domestic supplies to Harris and her patients,

[3] What this amounts to is that UCP pays Harris something like forty percent of what IDHS distributes to UCP for "direct care staff" and "supervision," although "supervision," in this sense, does *not* include the money IDHS gives UCP for administrative overhead.

> UCP requires Ms. Harris to pay the Residence's utilities and household expenses, including gas, electricity, water, trash, telephone and internet, along with lawn care and snow removal, out of her *per diem*. It also leaves her to buy food, toiletries and household supplies for the CILA residents with her own money.
>
> UCP has deducted the Residence's water bill from Ms. Harris's *per diem*...[I]t also deducts $5 from her *per diem* whenever she asks for help taking a participant to a medical appointment.

ECF 1 at 14. The contracts under which Harris has worked for UCP have not authorized any deductions from her pay.[4] Harris's contract does, however, state that her residence in the home "is considered part of the compensation package, with a market value of $3,300" per month.[5] UCP's contracts name Harris a contractor, rather than an employee.

---

[4] While I have not held an evidentiary hearing in anticipation of a decision on a preliminary injunction, Harris alerted UCP to her motion for a TRO and UCP both filed a response and appeared for an initial hearing. In neither the response nor the hearing did UCP dispute the characterizations of this paragraph.

[5] Harris asserts that UCP has paid off the mortgage of this house, meaning that its expenses in maintaining the home, occupancy of one third of which is apparently worth $3,300, amount to property taxes, insurance, utilities, and maintenance.

It may be noteworthy that, if the program is functioning as Illinois regulations lay out, IDHS is supposed to cover all of those expenses for UCP. 59 Ill. Admin. C. 115.130(a)(1) ("The 'room and board' allowance includes costs incurred in keeping a home in normal operation...[including] B) Utilities; C) Telecommunications; D) Building and Property Insurance; E) Maintenance and Housekeeping...H) Other, not elsewhere classified.").

**B. The Instant Facts**

Harris signed her most recent annual contract with UCP in July 2026. In September 2026, Harris wrote the managerial staff at UCP to ask for more information about why the home's water bills were now being deducted from her paycheck, and on the twenty-ninth of that month, she wrote UCP again to disclaim responsibility for the water bill and to request reimbursement. This was not the first time that Harris had raised concerns about UCP's pay practices. She had previously sued UCP and won a settlement concerning overtime and minimum wages. *See Harris v. UCP Seguin of Greater Chicago*, Proposed Settlement Agreement, 1:25-CV-12350, ECF 9 (N.D. Ill. Oct. 21, 2025) (later approved). In June 2026, UCP apparently announced to its regular staff—those it calls employees, rather than contractors—that it was because of Harris's lawsuit that it could no longer offer overtime or Christmas bonuses. ECF 1 at 18.

In response to her letters, UCP management met with Harris on October 9, 2026. Harris reiterated her concerns about the water bills and disputed her classification as an independent contractor, rather than an employee. UCP told Harris that its *de facto* practice had always been to bill its caregivers for the costs of the homes that it owned and presented her with a new contract (called by the parties the "New Agreement") that would make that practice *de jure*. It would also, *inter alia*, require Harris to

submit any future disputes to arbitration. The New Agreement stipulated that Harris and UCP would split the costs of any such arbitration. Harris did not at that time sign the New Agreement.

Through mid-October, Harris reported the utility deductions to IDHS, wrote to the IDHS Division of Developmental Disabilities to ask how much of the CILA stipend was supposed to end up in her *per diem*, and wrote UCP management to let them know she would not be signing the New Agreement and to ask them to stop deducting costs from her pay. On October 23, Harris's current counsel mailed UCP a demand for record preservation. Despite that UCP's counsel then began to correspond with Harris's counsel, UCP management emailed Harris directly on October 30.

The October 30 email stated that: "In order for you to continue providing services, please sign and return the New Agreement...no later than November 9, 2026." ECF 9 at 56. It went on to say that:

> If UCP Seguin does not receive your executed New Agreement by November 9, 2026, services under your current agreement will not extend past that date. Be advised that UCP Seguin is ending your services pursuant to and in accordance with the terms of your current agreement effective November 9, 2026. UCP Seguin cannot and will not continue engaging your services without a signed New Agreement in place.
>
> ...
>
> If you do not return a properly executed New Agreement, your current agreement will end, and UCP Seguin will contact you separately regarding next steps, including

> the transition of services for the individuals in the home and matters relating to the residence.

*Id.* Harris filed this lawsuit two days later and moved for a TRO two days after that.

Harris's suit includes ten counts, but only three are relevant to the instant motion. In Counts VIII–X, respectively, she alleges that UCP's actions in September and October 2026 constituted retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203 *et seq.*; the Illinois Whistleblower Act (the "Whistleblower Act"), 740 ILCS § 174/5 *et seq.*; and the Illinois Wage Payment and Collection Act (the "Wage Act"), 820 ILCS 115/1 *et seq.* She moves under those laws to restrain UCP from either forcing her to sign the New Agreement or evicting her if she does not, and she requests the same relief for a class of similarly situated caregivers working for UCP. UCP has opposed the motion.

**III.**

A plaintiff seeking a temporary restraining order, as with a preliminary injunction, must show that "[s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under Federal Rule of Civil Procedure 65(c), I may only issue a TRO if the moving party posts security "to pay the costs

and damages sustained by any party found to have been wrongfully enjoined or restrained," although I set security at the amount that I "consider[] proper." And I enjoy considerable discretion in deciding whether to issue a temporary restraining order. *Storck USA, L.P. v. Farley Candy Co*, 14 F.3d 311, 314 (7th Cir. 1994).

**IV.**

Harris's motion seeks to prevent UCP from catching her on the horns of a dilemma: either sign the New Agreement, in which she forfeits many of her complaints and writes off her access to federal court; or fail to sign, and face eviction. The motion also attempts to enjoin UCP from presenting the same set of options to other caregivers in Harris's position. Addressing that attempt would have involved the somewhat thornier issue of my authority to extend prospective injunctive relief to an as-yet uncertified class. But as UCP detailed in a hearing on Harris's motion, it pre-empted her attempt to protect that class by securing the signature of every other adult foster care worker in its employ during October 2026, before Harris filed her suit. As such, I need not address relief as to the class and can proceed with the prospect of a TRO as to Harris alone.[6]

---

[6] I note, however, that I will need to address whether the arbitration clauses of the New Agreements signed by Harris's peers will have any effect when the time comes for class and

### A. Likelihood of Success on the Merits

Harris's success in her claims in Counts VIII–X depends on two findings. First, is she an "employee" for the purposes of the FLSA, the Whistleblower Act, and the Wage Act? And second, when UCP presented Harris with the New Agreement shortly after she began complaining about her wages, deductions, and contractor status, was that "retaliation" for the purposes of the FLSA and the two Illinois laws? At this preliminary stage, the answer to both questions is yes.

#### 1. Employee or Contractor

The FLSA's definition of employee has been the subject of much litigation, and there is a more-or-less standard set of factors that I weigh to determine whether or not a given worker falls within its ambit. The Whistleblower and Wage Acts' definitions, by contrast, have been the subject of little or no learned opinions, although each statute has a set of three identical factors for me to consider. I will take the federal law and then move onto the state statutes.

---

collective certification. *See, e.g.*, *Degidio v. Crazy Horse Saloon & Restaurant Inc.*, 880 F.3d 135, 142–43 (4th Cir. 2018).

The FLSA defines "employee" as "any individual employed by an employer."[7] 29 U.S.C. § 203(e)(1). Both parties rely on *Secretary of Labor v. Lauritzen* to interpret this language, so I too will take that case as my lodestar. 835 F.2d 1529 (7th Cir. 1987).

The panel in *Lauritzen* considered whether migrant pickle-pickers, hired seasonally and at piece wages, were employees for the purposes of the FLSA.[8] *Id.* at 1532–33. The court used six criteria to evaluate their status:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanency and duration of the working relationship;
>
> 6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* at 1535.

---

[7] Neither here nor in the context of the Illinois laws has UCP disputed that it is an "employer" for present purposes.

[8] Inasmuch as a pickle does not grow from the ground and instead is made from a cucumber, the court was resolute in referring to the crop concerned as "pickles".

In *Lauritzen*, the plaintiff pickers decided what pickles to pick and what pace to pick at, while the farmer decided what portion of field would be picked and when, the rates that would be paid for each pickle, and, significantly, "the entire pickle-farming operation" apart from "the details of harvesting." *Id.* at 1536. In this case, Harris makes decisions in the moment about how to care for her charges, but the fact of that care, the assignment of Harris to her particular patients, the nature of the care she is assigned to provide, the hours that she must work, and the entire 'care-providing operation' are within the control of UCP.

The *Lauritzen* court explained that "profit and loss" was meant to refer to a worker's management of an investment. Given that the pickers had no investment in the farm that they could profit from or lose, this factor weighed in favor of their being employees. *Id.* The court found that the "loss" that a picker would suffer if on a given day he picked his pickles slowly was a loss of "wages" and did not affect this factor. *Id.* Harris has no investment at risk, and she does not even have the opportunity to suffer the kind of loss a slow picker would. Her *per diem* is fixed, and she cannot by any greater or lesser exercise of managerial ability either increase or decrease her earnings.

In *Lauritzen*, the migrant workers' only capital investment in their work was gloves, which they were required to provide and

which the court found insufficient to weigh in favor of them being independent contractors. *Id.* at 1537. The same is true of Harris, who has made no capital investment whatever.

The migrant workers in *Lauritzen* had to "develop some specialized skill in order to recognize which pickles to pick when," but the court wrote that "this development of occupational skills is no different from what any good employee in any line of work must do." *Id.* Harris must have developed similar skills in order to care for her charges, but as the *Lauritzen* court noted, "Skills are not the monopoly of independent contractors." *Id.*

In *Lauritzen*, the court suggested that migrant workers, even though they picked pickles only seasonally, could be considered "permanent" workers in the sense that many of them returned year after year to the same farm. *Id.* Harris's claim to permanency is more straightforward—she labors for UCP on an indefinite basis under an indefinite contract, as do most employees in most employments in this country.

Finally, it was an inescapable conclusion to the *Lauritzen* panel that if a farm's business is growing and harvesting and selling pickles, then the migrants' part—harvesting pickles—was an integral part of the business. *Id.* It is equally inescapable that if UCP's business is siphoning off some of the money allocated by Medicare to provide long-term care to developmentally disabled

adults, then Harris's part—caring for those adults—is integral to UCP's business.

Each of these factors, with the possible and minor exception of Harris's level of skill—that some aptitudes are acquired without an accompanying degree makes them no less useful or hard-won—weighs in favor of finding her to be an employee. For the purposes of this motion and the FLSA, then, I find that she is likely to succeed in showing that she is one.

The Whistleblower Act defines an "employee" as "any individual permitted to work by an employer" except where:

> (1) the individual has been and will continue to be free from control and direction over the performance of his or her work, both under his or her contract of service with his or her employer and in fact;
>
> (2) the individual performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with parties for the placement of employees; and
>
> (3) the individual is in an independently established trade, occupation, profession, or business.

740 ILCS 174/5. The definition of "employee" is virtually identical in the Wage Act.[9] There appears to be little or no authority

---

[9] As used in this Act, the term "employee" shall include any individual permitted to work by an employer in an occupation, but shall not include any individual:

> (1) who has been and will continue to be free from control and direction over the performance of his work,

interpreting this definition—UCP, for example, simply exhorts me to "apply each governing test to supported facts"—so I apply the above definition on its own terms. ECF 14 at 8.

In the same way that Harris is in no way free from the control of her employer for the purposes of the FLSA, she is not free for the purposes of the Illinois statutes either. Likewise, UCP's business is contracting with IDHS to provide, through its workers, Medicaid benefits to beneficiaries. Given that Harris is the last link in that chain, her work is not "outside the usual course of [UCP's] business." *Id.* And 'Medicaid waiver in-home health aide' is a trade or business only inasmuch as it exists as a piece of the businesses of public-private partners like UCP. Which is to say it is not an independent trade. At least at this stage, I find

---

> both under his contract of service with his employer and in fact; and
>
> (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and
>
> (3) who is in an independently established trade, occupation, profession or business.

820 ILCS 115/2.

that Harris likely to be found an employee for the purposes of the Whistleblower and Wage Acts.

**2. Retaliation or Not**

All three statutes here, the FLSA, the Whistleblower Act, and the Wage Act, require that for a given action by the employer to be considered retaliation, the employee must first have engaged in protected activity. Harris asserts, UCP does not dispute, and I agree, that her correspondence with UCP in September and October 2026 constituted protected activity. Where the parties differ is on whether the timeline of Harris's correspondence with UCP, and UCP's presentation of the New Agreement to Harris and her colleagues, raises an inference of retaliatory intent.[10]

Under the FLSA, it is unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed a complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). Under the Whistleblower Act,

> An employer may not take retaliatory action against an employee who discloses or threatens to disclose to a public body conducting an investigation...information

---

[10] To make out a *prima facie* case of retaliation under the FLSA—and by extension, the Illinois statutes—a plaintiff must show that she engaged in protected activity, that there was an adverse action by her employer, and a causal link between the two. *Swidnicki v. Brunswick Corp.*, 23 F. Supp. 3d 921, 934 (N.D. Ill. 2014).

> related to an activity, policy, or practice of the employer, where the employee has a good faith belief that the activity, policy, or practice [] violates a State or federal law, rule, or regulation.

740 ILCS 174/15(a). And under the Wage Act,

> Any employer, or any agent of an employer, who discharges or in any other manner discriminates against any employee because that employee has made a complaint to his or her employer, to the Director of Labor or his or her authorized representative, in a public hearing, or to a community organization that he or she has not been paid in accordance with the provisions of this Act, or because that employee has caused to be instituted any proceeding under or related to this Act, or because that employee has testified or is about to testify in an investigation or proceeding under this Act, is guilty, upon conviction, of a Class C misdemeanor. An employee who has been unlawfully retaliated against shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, all legal and equitable relief as may be appropriate. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.

820 ILCS 115/14(c). The parties treat the above standards as if they were identical in terms of what Harris must prove, and I agree that a showing as to one suffices as a showing as to the remainder.

Harris's theory of the case is this. UCP is aware that a complaint from her may not stay just a complaint, because she has shown her employer that she knows the way to federal court. She recounts that UCP has told other employees that her prior lawsuit is the reason it can no longer extend overtime or bonuses. And she notes the suspicious timing of the presentation of the New Agreement—she had just signed her annual contract in July, and was

presented with the New Agreement on October 9, immediately after she had begun to question aspects of her compensation and the monies deducted therefrom. And then, when instead of signing Harris hired a lawyer, UCP presented her with the October 30 letter which told her to sign or be fired.

For its part, UCP asserts that this is all innocent coincidence. It had been UCP's longtime unspoken and uncontracted-for policy to deduct household expenses from the stipends of its in-home care workers. When Harris complained about the water bill deductions from her pay, UCP realized that it had ought to write those deductions into its contracts. It extended Harris an olive branch in the form of $2,400 or so in refunded water bills and then offered each of its workers the opportunity to sign onto a regularized New Agreement. Harris's complaints were not something to retaliate against at all, in this telling, but instead an opportunity to get everyone onto the same page.

One of these stories is more convincing. It seems out of the ordinary to rewrite, as UCP did, a whole swathe of employee contracts over the course of two or three weeks and then scramble to ensure that every concerned employee had signed on before Harris had the opportunity to file suit. And where UCP avers that it was just regularizing a practice of deducting household expenses, that does not explain why UCP *also* included a particularly onerous cost-

splitting arbitration clause in that same contract revision. And finally, while UCP presents this as a friendly contract revision between employer and contractor, what it looks like instead is an employer confronting an employee with an ultimatum: abandon your lawsuit or abandon your home. This is a strong showing as to retaliation.

**B. Irreparable Harm and the Balance of Equities**

The Seventh Circuit has explained that these two factors are related to one another and to the likelihood of success. My role is to decide whether the harm which may result in the absence of a TRO is 'irreparable'—that is, cannot be fixed with the payment of money—and, if so, how it balances against the harm UCP stands to suffer if I grant the motion for a TRO. And "[I] evaluate these harms using a sliding scale approach. The more likely it is that [Harris] will win its case on the merits, the less the balance of harms needs to weigh in [her] favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A, Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008).

Harris asserts that without a TRO, at least two harms will take place. First is the loss of her home. Second is the chilling of speech and the exercise of statutory rights that comes about when an employer is allowed to retaliate following an employee's engagement in protected activity. Most of UCP's written response

and all of its response at the hearing on this motion was that there is no guarantee that, if Harris failed to sign the New Agreement, she would be evicted.

Harris is at least provisionally on solid ground. The Seventh Circuit has held, in the context of an *owned* home, that "a given piece of property is considered to be unique, and its loss is always an irreparable injury." *United Church of the Medical Ctr. V. Medical Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982); *accord Vignola v. 151 North Kenilworth Condominium Ass'n*, 2016 WL 6476547, at *5 (N.D. Ill. Nov. 2, 2016) ("[T]here can be no adequate remedy at law for loss of a home.") (quoting *In re Ameriquest Mortgage Co.*, 2006 WL 1525661, at *5 (N.D. Ill. May 30, 2006)). Harris does not own the home in which she works for UCP, but certainly the loss of the home in which one lives and has lived for years cannot entirely be made up with money. Likewise, courts have found irreparable harm where employers' retaliatory acts chill employees' engagement in protected activities. *E.g. Hitterman v. List Industries, Inc.*, 610 F. Supp. 3d 1105, 1142-43 (N.D. Ind. 2022). Here, where termination would result not just in the loss of a job and an income but a home at the same time, the potential chilling effect is especially potent.

As to whether or not the above-threatened harms are likely to happen, UCP's assertion that it might not evict Harris if she

fails to sign the New Agreement by the November ninth deadline is flimsy at best. UCP's late October letter to Harris told her explicitly that if she failed to sign the New Agreement, she would be terminated and that someone else would have to assume the care of her two charges. In fact, the letter made that point on the order of a half-dozen times. Given the nature of the CILA program, Harris's replacement would have to live in the home that Harris currently occupies. Which means that on the letter's own terms, Harris would *have* to be evicted in the event of non-signature.

On the other side of the balance, UCP stands to lose very little, if anything, if I impose a TRO. Harris will continue to perform her work and UCP will continue to take something like sixty percent of the money that IDHS has earmarked for the staffing expenses needed to provide for the two women in Harris's care. At worst, UCP will lose out on the money it was deducting from Harris's paychecks to pay the water bills at her home. Even were Harris's showing of likely success less strong, this factor would be in her favor.

**C. The Public Interest**

Here, where the scope of the contemplated TRO has been narrowed to only Harris and her terms of employment, the potential for impact on the public interest, in the negative sense, is minimal. UCP's arguments on this factor all bear on the potential

for a TRO to disrupt their entire CILA program. Now that UCP has induced every other employee in Harris's position to sign the New Agreement, no such disruption is possible. On Harris's side, the public interest is furthered at least, with reference to the above section, by restraining the chilling effect on other employees of forcing Harris to choose between her statutory rights and her home.

### D. Security

Harris asks me to allow her to forego posting security or to set it at a nominal amount, while UCP asks me to allow them to make a presentation as to their potential costs in the event of the disruption of their CILA program. Here, where UCP's potential costs have been narrowed to the non-collection of their legally-dubious deductions from Harris's paycheck, the amount of security that I "consider[] proper" is none. Fed.R.Civ.P. 65(c).

## V.

I grant Harris's motion for a temporary restraining order as to herself, though not as to her putative collective or class. Defendant UCP is barred from terminating Harris's employment, evicting Harris from her current residence, or otherwise coercing her to sign the New Agreement, pending a hearing on a preliminary injunction. This order stands for an initial period of fourteen days.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge
Dated: November 6, 2026